# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

_____

|  |  |  |
|---|---|---|
| PAUL NESBIT, *et al.*, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-01217-CNH-IDD |
| | ) | |
| MARTIN ARASE, *et al.*, | ) | |
| | ) | |
| *Defendant.* | ) | |

_____)

### PLAINTIFF'S OBJECTIONS TO DEFENDANT'S INTERROGATORIES

Plaintiff objects and responds to Defendant's First Set of Interrogatories as follows:

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

Plaintiff objects to Defendant's Definitions and Instructions to the extent they seek to impose a greater burden on Plaintiff than the requirements of this Court and the Federal Rules of Civil Procedure. Plaintiff further objects to the extent they seek production of information protected by the attorney-client privilege or work product doctrine.

### SPECIFIC OBJECTIONS TO INTERROGATORIES

**Interrogatory No. 1:**

Identify fully each and every person, excluding legal counsel, who assisted in responding to these Interrogatories, and identify which Interrogatories, or portions thereof, each such person assisted in responding to.

**Answer:** Plaintiffs answered these interrogatories with the assistance of counsel.

1

**Interrogatory No. 2**:

Identify each and every person whom either Plaintiff knows or believes has knowledge of facts pertinent to any allegation in the Complaint and for each such person, describe the substance of the knowledge he or she has or is believed to have.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent it seeks information protected by the work product doctrine.  Plaintiff further objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE**: Subject to and without waiving the foregoing objection, Plaintiff states that there are a large number of individuals that have knowledge of the facts pertinent to the allegations in the Complaint.  These individuals include (a) current and former employees of Eagle Systems and Services and The Columbia Group; (b) individuals who were contracted to provide various third-party or externally-provided support services to Eagle Systems and Services and The Columbia Group; (c) individuals who were industry partners to Eagle Systems and Services; and, (d) legal professionals contracted by Eagle Systems and Services and The Columbia Group for existing and/or prospective efforts requested by Eagle Systems and Services and The Columbia Group.  It is unduly burdensome to identify each individual with pertinent to the Complaint's allegation given Defendants' greater or equal access to these individuals; however, the following individuals have particularly relevant information:

    a.   Plaintiff Paul Nesbit

    b.   Plaintiff Barry Wells

    c.   Defendant Eagle Systems & Services, Inc.

    d.   Defendant The Colombia Group, Inc.

2

e.   Martin Arase

Plaintiffs believe Mr. Arase has knowledge of Plaintiff's job performance, protected activity, and the reasons for their termination.

f.   Lea Ann Wolcott

Plaintiffs believe Ms. Wolcott has knowledge of Plaintiff's job performance, protected activity and the relationship between Eagle Systems & Services, Inc. ("ESS") and The Colombia Group, Inc. ("TCG"). Plaintiffs believe that Ms. Wolcott has knowledge of the control maintained by Mr. Arase from TCG over ESS.

g.   Stephan Ellis

Plaintiffs believe Mr. Ellis has knowledge related to the relationship between ESS and TCG., including the control maintained by Mr. Arase from TCG over ESS.

h.   Linda Garcia

Plaintiffs believe Ms. Garcia has knowledge of Plaintiffs' job performance, protected activity, and the relationship between ESS and TCG, including the control maintained by Mr. Arase from TCG over ESS, especially as it relates to the authority, direction, and control maintained by Mr. Arase from TCG on ESS budgeting, financing, lines-of-credit, and business development bid pricing.

i.   Rick Perkins

Plaintiffs believe Mr. Perkins has knowledge of Plaintiffs' job performance, protected activity, and the relationship between ESS and TCG, including the control maintained by Mr. Arase from TCG over ESS, especially as it relates to the authority, direction, and control maintained by Mr. Arase on ESS and his efforts to obstruct, delay, and ultimately deny and block Plaintiffs efforts to make ESS a qualified WOSB.

j.   Michelle Kammerer, Mary Holmes, and Stephanie Alexander.

Plaintiffs believe these former employees of TCG have knowledge of the relationship between ESS and TCG concerning physical sharing and integration of Human Resource systems, infrastructure, personnel, benefit plan, 401k plans, and business processes—including the control maintained by Mr. Arase from TCG over ESS.  Plaintiffs also believe these individuals have some knowledge of Plaintiffs' protected activity.

3

k.  Ray King and Bob May

Plaintiffs believe these former employees of ESS have knowledge of the relationship between ESS and TCG, including the control maintained by Mr. Arase from TCG over ESS. Plaintiffs believe that these former employees also have knowledge of ESS's false billing of the government based on its ineligibility as a Woman-Owned Small Business ("WOSB") during their employment with ESS, starting on/about January 2017.Plaintiffs further believe that Mr. King and Mr. May have knowledge of Martin Arase's control of ESS's finances, expenditures, and bid pricing.  Mr. King and Mr. May are also aware of ESS receipt of "Cure Letters," labor grievances, status of business development pipeline upon the start of Plaintiffs' employment tenure, and Plaintiffs' performance in addressing those issues and Plaintiffs' performance generally. Plaintiffs also believe that these individuals have knowledge of the authority, direction, and control maintained by Mr. Arase from TCG on ESS business development opportunity capture and proposal bid pricing.

l.  Marques Peterson

Plaintiffs believe Mr. Peterson has knowledge of the relationship between ESS and TCG and Plaintiffs' reports and efforts to stop violations of the False Claims Act as it relates to business development.

m.  Renee Pezold and Jim Lexo

Plaintiffs believe these individuals have knowledge of the Northern Taiga Ventures Incorporated's (NTVI) effort to acquire Eagle Systems and Services and/or its contract assets as well as the control maintained by Mr. Arase over ESS during this process. Plaintiffs believe that these individuals have knowledge of the relationship between ESS and TCG and Plaintiffs' reports and efforts to stop violations of the False Claims Act.

n.  Jonathan Fonseca and John Potts

Plaintiffs believe these individuals have knowledge of Plaintiff's extensive business development efforts, initiatives, progress with government acquisition requirements development as well as Martin Arase representing himself as the owner and controlling decisionmaker of ESS during discussions of a business opportunity with Toll Group International and CornerBrooke LLC..

o.  Adelina McKim

4

Plaintiff Nesbit's wife has second-hand knowledge of the basis for Plaintiffs' lawsuit and first-hand knowledge of the emotional distress damages Mr. Nesbit has experienced as a result of his termination.

**Interrogatory No. 3:**

Identify each and every person (excluding legal counsel) from whom either Plaintiff received a written statement concerning any allegation in the Complaint and state the date and substance of that statement.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent it seeks information protected by the attorney-client privilege, work product doctrine, or spousal or marital communications privilege. Plaintiff further objects to the request to the extent the burden of identifying information regarding each communication outweighs its benefit.

**RESPONSE**: Subject to and without waiving the foregoing objections, Plaintiff states that he has not currently sought a written statement from third parties regarding the Complaint.

**Interrogatory No. 4:**

If Plaintiffs contend that any Defendant has made an admission pertinent to any of the allegations in the Complaint, please identify the alleged admission, the person you claim made the admission, any document embodying or evidencing the admission, and the date, time and circumstances surrounding the alleged admission.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent it seeks information protected by the

work product doctrine.  Plaintiff further objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE**: Subject to and without waiving the foregoing objections, Plaintiff states that Martin Arase made a variety of admissions concerning the fact that ESS was not qualified as a WOSB during the time period between the Plaintiffs' January 4, 2019 submission of the "20 Critical Steps to Eliminate Protests and Other Risks," document, including Mr. Arase's agreement that he would take steps to correct the issue by November 1, 2019.

Plaintiff also states that Rick Perkins facilitated numerous weekly or bi-weekly meetings between Plaintiffs and Mr. Arase to discuss, affirm, and determine steps needed to separate the extensive affiliation that existed between TCG and ESS across physical, resource, business systems and processes, infrastructure, facilities, control maintained from TCG by Mr. Arase over ESS, and the complete lack of involvement in ESS by Ms. Susan Arase as the purported owner of ESS. Plaintiff also states that Mr. Arase's response in an email with Plaintiffs, Susan Arase, and Rick Perkins on October 3, 2019 confirms TCG's and Mr. Arase's firm and singular grip on control over ESS, forcing a level dependency by ESS on TCG and through Mr. Arase that threatened the ability of ESS to operate independently.

**Interrogatory No. 5**:

Identify each person whom Plaintiffs expect to call as an expert witness at trial or any evidentiary hearing in this matter and state the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

**Answer:**  Plaintiffs do not intend to call expert witnesses at this time.

6

**Interrogatory No. 6:**

Identify and describe each communication, whether oral or in writing, between Plaintiffs, or any person acting on Plaintiffs' behalf (excluding counsel), and any other person relating to the allegations set forth in the Complaint. Include in your answer the means of communication (e.g., phone call, email, written correspondence), date of such communications, the person(s) present during or participating in such communications, and the substance of such communications.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent it seeks information protected by the work product doctrine.  Plaintiff further objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE:** Subject to and without waiving the foregoing objection, Plaintiff states that other than counsel and his co-Plaintiff, he has only discussed the case with his wife, Adelina McKim. On multiple occasions, Plaintiff and his wife generally discussed the fact that he had been terminated, his contention that he was terminated because he had attempted to stop violations of the False Claims Act, and the fact that he intended to bring a lawsuit against Defendants.

Plaintiff has also spoken with Jonathan Fonseca generally about the fact of and overall basis of Plaintiffs' lawsuit against Defendants.

**Interrogatory No. 7:**

Identify all Plaintiffs' communications, between January 2019 and the date of Plaintiffs' employment termination from ESS, you contend constitute protected disclosures. Include in

your answer the means of communication (e.g., phone call, email, written correspondence), date of such communications, the person(s) present during or participating in such communications, the substance of such communications.

**Answer:** On January 4, 2019, Plaintiff Paul Nesbit, with contributing authorship of Plaintiff Barry Wells, submitted a document to Mr. Arase and Mr. Perkins entitled "20 Critical Steps to Eliminate Protest and Other Risks" which categorically assigned 20 vital action areas and items necessary to help bring ESS into compliance with various federal statutes and regulations. This document became the basis for multiple discussions between Plaintiffs and Mr. Arase and Mr. Perkins, frequently facilitated by Rick Perkins, between January 2019 and the date of the Plaintiffs' employment termination. These discussions occurred on a weekly and/or biweekly basis and were almost in all cases facilitated by witness Rick Perkins.

Following the January 4, 2019 email, Plaintiffs repeatedly cautioned, warned, and submitted action plans to Mr. Arase to stop the illegal activity, fully separate the two firms, and have Ms. Arase manage ESS on a day-to day basis as was being represented to the government. Plaintiffs repeatedly submitted and briefed detailed lists to Mr. Arase and others identifying the steps and actions and timelines needed to stop the illegal activity and bring the firm into compliance with federal regulations.

Plaintiffs repeatedly informed Mr. Arase, Mr. Rick Perkins (Mr. Arase's senior business advisor), and several others that (a) ESS was liable not only to the federal government but potentially also to other federal government contractors through current and future teaming and business development efforts; (b) concerned about the corporate and personal liabilities due to the federal False Claims Act, FAR, and CFR violations; (c) as corporate officers, Plaintiffs were responsible for reporting illegal activities given professional and personal exposure to federal False Claims Act, FAR, and CFR violation liability; and, (d) as a result of this exposure and liability, could no longer conduct business development efforts.

Plaintiffs also provided to Mr. Arase and Mr. Perkins examples of federal government contracting firms that had been found in violation of the federal False Claims Act—examples which included significant debarment terms and punitive fines.

Plaintiffs also met with Mr. Perkins and Mr. Arase in ESS and TCG's Fairfax offices beginning in January 2019 to discuss the need to separate ESS from TCG and make it compliant with the requirements for WOSB.  Both Plaintiffs individually and jointly told told Mr. Arase and Mr. Perkins that ESS and its officers were at extreme legal risk because it was not truly functioning as a WOSB.   During these conference calls and in-person meetings, Plaintiffs, both individually and jointly, told Mr. Arase and Mr. Perkins that TCG and ESS were violating regulations pertaining to the Small Business Administration, Federal Acquisition Regulations, and Misrepresentation/False Claims.  Plaintiffs jointly and repeatedly warned Mr. Arase and Mr. Perkins that ESS was not eligible to represent itself as a WOSB or bill the government on existing WOSB-contracts and that ESS was submitting false proposals for future contracts.

For example, Plaintiffs learned that ESS had won a contract award as a WOSB pursuant to the EAGLE BOA II Multiple Award Contract at US Army Fort Polk Logistics Readiness Center's Ammunition Supply Point prior to their employment and had operated on the contract since 2016.  Once it became clear to Plaintiffs that ESS was not actually qualified to be a WOSB, Plaintiffs repeatedly warned Mr. Arase and Mr. Perkins that ESS was not eligible to bill the government on this contract.  Mr. Arase indicated that he would correct the issue by November 1, 2019.

On February 22, 2019, following more than a month without progress on separating ESS from TCG, Mr. Wells met with Mr. Arase and Mr. Perkins.  Mr. Wells reiterated the legal risks involved with misrepresenting ESS as a WOSB on its current contracts and bids for future contracts and requested that the company address the issue with urgency.

On June 20, 2019, Mr. Wells met with Mr. Arase, Mr. Perkins, and Mr. Nesbit and again he implored Mr. Arase to take the steps necessary to make ESS a WOSB.  From June to August

9

2019, Mr. Wells worked with an ESS and TCG employee, Linda Garcia, to create a plan to delegate authority from Mr. Arase to separate ESS and TCG. Mr. Arase ultimately refused to authorize the delegation.

In an email dated July 12, 2019, (See Amended Complainant, Exhibit C) Mr. Nesbit detailed a conversation he had with a law firm who was enlisted to help ESS with exploring the pursuit by ESS of a Japanese business license required by ESS were it to be awarded a US Marine Corps logistics contract which would require ESS to employ Japanese nationals at multiple US government military installations in Japan under the Status of Forces Agreement (SOFA). During this conversation, and as part of the law firm's due diligence regarding considering representation of ESS, the law firm revealed to Mr. Nesbit its findings in assessing ESS as a potential client. Mr. Nesbit's letter to Mr. Arase, Mr. Perkins, and Mr. Wells again details the need for ESS and TCG group to decouple and become compliant with federal regulations. The letter states that:

a.  The law firm noted "substantial linkages … between ESS and TCG";

b.  The law firm affirmed that protests are common in government contracts and expressed grave concern that ESS, including officers of ESS, could be at risk;

c.  As noted repeatedly in other communiques, steps should be taken to decouple ESS from TCG, including the immediate transfer of business and information systems, data and authority—along with other areas of affiliation between TCG and ESS—to ESS internally, including, as an example, Mr. Wells as the head of operations with direct oversight on personnel assigned directly to government contracts.

In an email dated July 18, 2019, (See Amended Complaint, Exhibit D), addressed to Ms. Arase, Mr. Arase, and Mr. Perkins, Mr. Nesbit again warned of protests being launched again ESS should it win or be on a winning team in pursuit of a competitive government contract. The email also states the need to "formalize Susan Arase as CEO."

In an email dated September 16, 2019 (See Amended Complaint Exhibit A) addressed to Mr. Arase and Mr. Perkins, Mr. Nesbit again warned of the growing risk of SBA, False Claims Act, FAR, and CFR violations that could be exposed by the common process of industry members filing protests during the very competitive government contracting procurement process. Plaintiffs continued to identify the significant risks associated with falsely representing the firm to the federal government as well as to industry partner companies, whose efforts to competitively win government contracts could also be at risk should the government determine the extent of ESS violations of the federal False Claims Act, FAR and CFR governance. Plaintiffs underscored the list of action items that needed to be done immediately to get ESS into compliance with federal regulations. The email further states that Plaintiffs have not been granted access to ESS's general ledger and do not understand, and cannot explain, some of the costs shown on financials. The Plaintiffs attempted to demonstrate the depth to which Mr. Arase through TCG was exerting control over the ability of the Plaintiffs to help represent accurate and competitive business development pricing as part of their job responsibilities and efforts to grow and sustain ESS.

In August and September 2019, Mr. Wells, along with Mr. Nesbit, continued to complain about the legal risks associated with ESS representing itself as a WOSB in the context of proposing a sale to NTVI, an Alaska Native Corporation, as a potential solution to address ESS's ineligibility to be a WOSB.

Mr. Wells discussed these risks during meetings with Mr. Arase, Mr. Perkins, and Mr. Nesbit during the week of September 23, 2019.

In a letter dated September 19, 2019, (See Amended Complaint, Exhibit B) addressed to Ms. Arase, Mr. Arase, and Mr. Perkins, Mr. Nesbit detailed that:

> d.  ESS is at significant risk of noncompliance with federal regulations governing women owned small businesses applying for government contracts;

e.  ESS and potentially its management staff and employees are at risk of civil and
criminal penalties for mispresenting itself as a Woman-Owned Small Business;

f.  Plaintiffs had submitted action plans to encourage ESS to become compliant;

g.  Plaintiffs discussed these concerns on several occasions;

h.  As of the date of this letter no steps, other than arbitrarily listing Ms. Arase as the
"CEO" of ESS on the company website, have been taken by Ms. Arase, Mr.
Arase, or Mr. Perkins, to bring ESS into compliance;

i.  Plaintiffs pleaded with ESS, Ms. Arase, Mr. Arase and Mr. Perkins to take
immediate action to comply with the federal regulations.

In a phone call three weeks prior to being terminated, Plaintiff Paul Nesbit, told Mr.
Arase and Mr. Perkins, that as an officer of ESS (Paul Nesbit – President) he felt an ethical
responsibility to report illegal activities of ESS if they persisted given the liabilities involved.

In an email dated October 21, 2019, (See Amended Complaint, Exhibit E) Mr. Nesbit,
copying Mr. Wells, again explained how a protest would be forthcoming if ESS and TCG did not
separate their business concerns and being operated as two distinct companies. Plaintiffs again
plead with Mr. Arase, Ms. Arase, and Mr. Perkins to choose a course of action, including (a)
either fix the violations of the federal False Claims Act, FAR, and CFR provisions; or, (b) or
clearly affirm to Plaintiffs that they intended to take no action.

In an email dated October 3, 2019 (See Amended Complaint, Exhibit F) addressed to Mr.
Arase, Ms. Arase and Mr. Perkins, Mr. Nesbit, copying Mr. Wells, detailed that he planned to
resign November 1, 2019 if corrections are not made to bring ESS into compliance with federal
regulations.

In subsequent discussions with Mr. Arase and Mr. Perkins, Plaintiffs stated that since Mr.
Arase had not supported any of the action items needed to separate ESS from TCG and to bring
the firm into compliance with federal False Claims Act, FAR, and CFR requirements—beyond

12

arbitrarily listing Ms. Arase on the company website as the "CEO"—they could not expose themselves and their families to the continued risk of federal and civil liability.

**Interrogatory No. 8:**

Identify all documents or communications you contend are relevant to demonstrating that Defendants knowingly or intentionally misrepresented ESS's status as a woman owned small business. Include in your answer the means of communication (e.g., phone call, email, written correspondence), date of such communications, the person(s) present during or participating in such communications, and the substance of such communications.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent it seeks information protected by the work product doctrine.  Plaintiff further objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE**: Subject to and without waiving the foregoing objections, Plaintiff state that the following documents demonstrate the Defendants' intentional misrepresentation of ESS as a WOSB:

- Corporate introductory briefings, capability statements, and copies of business development proposals and templates provided by Mr. King and Mr. May to Plaintiffs upon the start of their employment with ESS;

- Documents provided in business development meetings;

- ESS's responses to Requests for Information;

- Documents exchanged with potential partner firms;

13

- Documents exchanged in proposals;

- Prime and subcontracts in which ESS claimed to be a WOSB, including, as an example, records of the US Army Sustainment Command / US Army Contracting Command's "EAGLE BOA II contract vehicle" provided by Ms. Wolcott to Mr. Nesbit upon his joining ESS that show the US Army listing ESS as a "WO" (Woman-owned) small business contract holder of the EAGLE BOA II contract vehicle;

- Invoices for contracts for which ESS claimed to be a WOSB;

- The various communications between Plaintiffs, Mr. Arase, and other ESS and TCG employees concerning ESS's eligibility to operate as a WOSB, steps necessary to make ESS a WOSB, and efforts to avoid submitting invoices on contracts for which ESS falsely claimed to be a WOSB.

- Representations made by Mr. Arase of TCG on behalf of ESS at business development meetings, witnessed by John Potts of service-disabled veteran owned small business CornerBrooke and Jonathan Fonseca and other senior members of Toll Group International in Alexandria, Virginia and at the Toll Group East Coast Headquarters in New Jersey to which Mr. Arase traveled to attend a meeting on behalf of ESS.

- Representations made by Mr. Arase of TCG on behalf of ESS at meetings with employees, industry partners, and government clients of ESS at the Fort Polk Logistics Readiness Center's Ammunition Supply Point in Leesville, Louisiana.

**Interrogatory No. 9:**

Identify all documents or communications you contend are relevant to demonstrating that Defendants knowingly, intentionally and/or fraudulently misrepresented ESS's status as a

14

woman owned small business. Include in your answer the means of communication (e.g., phone call, email, written correspondence), date of such communications, the person(s) present during or participating in such communications, and the substance of such communications.

**<u>Answer:</u>**

**OBJECTION**: Plaintiff objects to the request to the extent it seeks information protected by the work product doctrine.  Plaintiff further objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE:** Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to their response to Interrogatory 8.

**<u>Interrogatory No. 10:</u>**

Identify all documents or communications that Plaintiffs contend are relevant to demonstrating that Plaintiffs' termination from employment with ESS was caused by or was a result of in any way the protected disclosures allegedly made by Plaintiffs as alleged in the Complaint. Include in your answer the means of communication (e.g., phone call, email, written correspondence), date of such communications, the person(s) present during or participating in such communications, and the substance of such communications.

**<u>Answer:</u>**

**OBJECTION**: Plaintiff objects to the request to the extent it seeks information protected by the work product doctrine.  Plaintiff further objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

15

**RESPONSE:** Subject to and without waiving the foregoing objection, Plaintiffs refer Defendants to their responses to Interrogatories 4 and 8. Additionally, Plaintiffs state that when Martin Arase informed Mr. Nesbit that he and Mr. Wells were to be terminated, he claimed that ESS could not afford to continue paying their salaries and was shutting down operations. This claim is false as ESS was making enough money to be profitable despite Mr. Arase transferring funds to other entities he controlled. Plaintiffs had taken on the roles of multiple positions starting in July 2018 and thus significantly reduced ESS's indirect costs and overhead. Despite the earlier restrictions applied by Prime contractor URS Federal/AECOM on ESS as a result of the two Cure Letters received by ESS from URS Federal/AECOM in 2016 and 2017 (prior to the Plaintiffs' employment at ESS) for unsatisfactory performance on the Fort Polk Logistics Readiness Center contract and which threatened the cancellation of the ESS subcontract with URS Federal/AECOM, Plaintiffs had dramatically turned around ESS' performance on the further expanded ESS' work, revenue, overhead contribution margin, and profit on the Fort Polk Logistics Readiness Center contract which itself was covering the Plaintiffs' salaries and other costs. To Plaintiffs' knowledge, ESS has continued operating, including on contracts at Fort Polk, Louisiana.

**Interrogatory No. 11:**

Describe in detail all damages claimed by Plaintiffs, including the category of each claim for damages, the amount claimed in each category, and the factual basis for the claim.

**Answer:**

Plaintiff Paul Nesbit currently computes his damages as follows:

a. Plaintiff is entitled to double the amount of backpay Defendants owe him which

currently totals $220,438.36.

b.  Plaintiff is to front pay in lieu of reinstatement which Plaintiff estimates at $360,000.

c.  Plaintiff is entitled to emotional distress damages of $500,000.

d.  Plaintiff's damages include pre- and post-judgment interest and attorney's fees, and may include expert witness fees, costs, and expenses;

**Interrogatory No. 12:**

Describe in detail all efforts on the part of Plaintiffs, from the date of their termination from employment with ESS and to date, to mitigate or avoid the damages alleged in the Complaint or as set forth in response to these Interrogatories.

**Answer:** Plaintiff states that the majority of his efforts to mitigate his damages are reflected in the records of job applications produced in discovery.  Upon the termination of his employment at ESS by Mr. Arase from TCG, Plaintiff has continually reached out to his network of professional contracts in an attempt to gain any sort of part-time or full-time employment, including as a paid or unpaid business development consultant, proposal manager, proposal writer, and/or proposal pricing analyst. In an effort to acquire any sort of income to cover personal expenses, extensive documentation will show that Plaintiff has attempted to gain part- or full-time employment on jobs with hourly wages as low as $14 per hour and in multiple geographic locations within the United States and in several foreign countries. In addition, in February 2020, Plaintiff was invited by two business associates to join a small start-up business, into which Plaintiff has invested roughly $30,000.00 in an additional effort to (a) create an employment opportunity; and, (b) in which Plaintiff has invested countless hours and efforts in an unpaid status writing and submitting numerous

17

business development proposals with multiple industry partner firms in the government contracting industry that are currently awaiting adjudication by various government organizations.

Plaintiff has simultaneously attempted to improve his job prospects by pursuing a Doctorate in Business Administration (DBA) with a formal specialization in Supply Chain Management from Liberty University, which he began while employed with ESS. At this time, Plaintiff has completed all of the doctoral degree coursework, maintains a 4.0 GPA, is a Delta Mu Delta Honors Student, and will graduate in December 2021 with his fourth advanced business degree.

**Interrogatory No. 13:**

Describe in detail the basis for Plaintiffs' belief, as set forth in paragraph 13 of the Complaint, that "Defendants, for all practical purposes, were integrated and operations were handled concurrently by a common core of ownership."

**Answer:**

TCG, through the actions of Mr. Arase, controlled ESS and Plaintiffs' employment. For example, Mr. Arase hired and fired Mr. Nesbit and Mr. Wells. Mr. Arase set Mr. Nesbit's and Mr. Wells' compensation and benefits. From TCG Mr. Arase maintained strict control and authority over ESS in all areas obligating, funding and approving the execution of indirect service centers and activities as well as the funding and approval of externally-facing client relationship and employee management efforts, initiatives, travel, and associated activities.

During Plaintiffs' employment, Mr. Arase controlled all of ESS' budgeting, financing, lines-of-credit, expenditures, credit card authorization, travel applications/funding and reimbursement, and other financial commitments.

During Plaintiffs' employment, ESS and TCG operated out of the same office in Fairfax, Virginia at 11211 Waples Mill Road, Suite 310, Fairfax VA 22030.  During Plaintiffs' employment, ESS and TCG shared  information technology (IT) infrastructure, human resources information systems, accounting systems, human resources employees, accounting department employees, facility security officer (FSO) employees, benefits providers, 401k plan providers and programs, workers compensation providers and programs, and business development consultants.

During Plaintiff's employment with ESS, Mr. Arase maintained and distributed personal business cards for himself that showed him as the "Director" of ESS and which document and affirm the use of the same physical office space for TCG and ESS at 11211 Waples Mill Road, Suite 310, Fairfax VA 22030.

During Plaintiffs' employment with ESS, the purported owner and controller of ESS, Susan Arase, made no appearances nor provided any communication, whether in person, by phone, or on email. The only "appearance" made by Ms. Arase during the entire tenure of Plaintiffs is via a singular, photocopied/autopen signature in Plaintiff's offer letter conveyed as documented by Mr. Arase to Plaintiff on March 22, 2018.


**Interrogatory No. 14:**

Describe in detail the basis for your belief, as set forth in paragraph 31 of the Complaint, that "Mr. Arase continually stepped over what the federal government considers a bright line between two government contracting firms being controlled by one person and being affiliated with shared resources, capabilities, or infrastructure of another entity."

**Answer:**  Plaintiff state that the regulations defining the requirements to be a WOSB require the management and daily business operations of the entity be controlled by a woman.  *See* 13

19

C.F.R. § 127.202.  Martin Arase exercised control over ESS's management and daily business operations and thus violated the rule articulated at 13 C.F.R. § 127.202.

**Interrogatory No. 15:**

Describe in detail the basis for your belief, as set forth in paragraph 39 of the Complaint, that "TCG was exerting control over the ability of the Plaintiffs to help represent accurate and competitive business development pricing as part of their job responsibilities and efforts to grow and sustain ESS." Include in your answer the means of communication (e.g., phone call, email, written correspondence), date of such communications, the person(s) present during or participating in such communications, and the substance of such communications.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE**:  Subject to and without waiving the foregoing objections, Plaintiffs state that Mr. Arase required ESS to submit bids with higher indirect rates and profit margins than were competitive.  For example, in October 2019, against the advice of Mr. Nesbit and Mr. Wells, Mr. Arase required ESS to increase its indirect rates and profit margins on the US Army Fort Benning Logistics Readiness Center business opportunity via the EAGLE BOA II contract vehicle and in support of the Army Sustainment Command and Army Contracting Command.  As a result of Mr. Arase's price increase, ESS lost the bid Mr. Nesbit had negotiated with Greg Guiney, Senior Vice President for Business Development, for prime contractor Vanquish Worldwide that would have provided 174 full-time equivalent (FTE) positions for ESS and contract values of:

(a) $7,285,254.90 in the first year;

(b) $9,805,636.60 in the second year;

(c) $9,813,358.35 in the third year;

(d) $9,821,311.66 in the fourth year; and,

(e) $9,929,503.58 in the fifth year.

This potential revenue would have more than tripled the size of ESS, providing a multi-year flood of contribution margin and profits, and granted ESS invaluable contract past performance and other extensive competitive differentials.

Mr. Arase also required ESS to submit bids with higher than competitive indirect costs and profit margins on proposals for contracts at Army "Fort Bragg UPH," Army "POM/MOTCO" Logistics Readiness Center, and Air Force Grand Forks Facilities Management.

**Interrogatory No. 16:**

Describe in detail all documents and communications related to your efforts to sell, transfer or convey, or to assist in the sale, transfer or conveyance of, ESS or its contracts to Northern Taiga Ventures or NTVI.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent it seeks information about documents and communications that are irrelevant to Defendant's potential liability.

**RESPONSE**:  Subject to and without waiving the foregoing objection, Plaintiffs state that in

September 2019, Jim Lexo,  a merger and acquisition (M&A) specialist representing NTVI, approached Mr. Nesbit about the possibility of NTVI acquiring ESS.  Mr. Nesbit and Mr. Wells discussed this opportunity with Mr. Arase and Mr. Perkins and Mr. Arase authorized Mr. Nesbit and Mr. Wells to discuss details of a potential sale.   Plaintiffs had multiple conference calls with Mr. Lexo and Renee Pezold of NTVI about the potential sale of ESS or ESS's contract assets, all of which were authorized by Mr. Arase.   On numerous occasions from September 2019 through October 2019, Ms. Pezold and Mr. Lexo discussed with Plaintiffs NTVI's intention of hiring Plaintiffs to continue managing and growing ESS and its contract assets upon completion its acquisition by NTVI.  Plaintiffs relayed this information directly to Mr. Arase and Mr. Perkins at TCG and discussed and affirmed how this continued employment would similarly benefit ESS ownership given NTVI's planned offer to pay ESS ownership on an "earn-out" basis for a nominal value of potential business development efforts being worked by Plaintiffs while employed at ESS.

From September 2019 through October 2019, NTVI made multiple, significant efforts to initially offer to purchase ESS as a corporate entity and then later changing their approach to simply offer to purchase the "contract assets of ESS," given Mr. Arase's decision or unwillingness to provide documentation at the request of the NTVI attorneys seeking to review documentation to confirm the structure of ESS, including the official ownership and control of ESS.   ESS did not complete a sale to NTVI during Plaintiffs' employment with ESS.

**Interrogatory No. 17:**

Identify all submissions to the Government, in which ESS claimed to qualify as Woman Owned Small Business, during the period of Plaintiffs' employment with ESS, to include

proposals for contract awards, responses to draft solicitations, responses to requests for information or other similar Government invitations for such proposals and responses. For each such submission, described in detail what role, if any, either Plaintiff had in preparing, reviewing or submitting said submission.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE:** Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to their document production at Nesbit/Wells 00130-00420.  Plaintiffs further state that ESS represented itself as a WOSB prior to, during, and upon information and belief, after their employment in proposals, RFIs, Sources Sought responses, and in marketing materials and business development documents.


**Interrogatory No. 18:**

Identify all contract and subcontract awards made to ESS by the Government or other entity during Plaintiffs' employment with ESS. For purposes of this Interrogatory, a contract or subcontract award would not include an exercised option under contract awarded prior to Plaintiffs' employment with ESS.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE:** Subject to and without waiving the foregoing objections, Plaintiff states in

23

February 2019, ESS won a contract expansion on the EAGLE BOA II contract vehicle and in support of the Army Sustainment Command and Army Contracting Command through prime contractor AECOM.  This expanded ESS's revenue on the contract by 20% or roughly $500,000 annually.

**Interrogatory No. 19:**

Identify all documents or communications in which either Plaintiff stated or claimed to any third party that ESS was a Woman Owned Small Business.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE:** Subject to and without waiving the foregoing objections, Plaintiffs state that they provided business development materials that ESS developed prior to Plaintiffs' employment to potential contracting partners.  Plaintiffs refer Defendant to the documents produced in this case for responsive documents and communications.

**Interrogatory No. 20:**

Identify all contracts with the Federal government, or subcontracts under a prime contract with the Federal government, that you contend were awarded to ESS based on a representation that it was a Woman Owned Small Business.

**Answer:**

**OBJECTION**: Plaintiff objects to the request to the extent the burden of identifying information equally or more readily available to Defendant outweighs its benefit.

**RESPONSE:** Subject to and without waiving the foregoing objections, Plaintiffs state that they believe ESS was awarded the following contracts based on its representation that it was a WOSB:

1. Department of the Army / Army Sustainment Command / Joint Munitions Command: Eagle Basic Ordering Agreement (BOA) II; subcontract W52P1J-12-G-0028-URSFS32402S (with option years).

2. US Army Medical Command (MEDCOM) / US Army Medical Material Agency (USAMMA); subcontract W81XWH13D0017 (with option years).

3. Department of the Navy: SEAPORT Next Generation (NXGEN); subcontract N0017819D7557.

**Interrogatory No. 21:**

Identify for Plaintiffs whether they performed work for ESS on a personal work computer or personal phone ("Personal Device"). For each Personal Device, identify and describe whether any documents or communications relevant to the Complaint's allegations were generated or stored on said device, whether those files are still located on said device or whether those files were lost or destroyed and, if so, identify the date and circumstance of their loss or destruction.

**Answer:** Plaintiff Nesbit performed work for ESS on his personal computer at the direction and with the authorization of Martin Arase given Mr. Nesbit's work as the lead graphics, workflow, and data visualization designer for business development and marketing proposals, using expensive graphics and data analytics software applications that Mr. Nesbit already maintained on his personal laptop and that Mr. Arase directed and authorized him to continue to use for the benefit of and to meet his job responsibilities.  Mr. Nesbit has not lost or destroyed any of these work documents to his knowledge and has not shared the documents

with anyone other than counsel.

Respectfully submitted,

Alan Lescht and Associates, PC

By: _____/s/_____
Jack Jarrett (VSB #86176)
1825 K Street, NW, Suite 750
Washington, DC 20006
T: 202.463.6036
F: 202.463.6067
jack.jarrett@leschtlaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2021, I served the foregoing document by email on counsel for Defendant in this matter.

Respectfully Submitted,

_____/s/_____
Jack Jarrett (VSB #86176)
1825 K Street, NW, Suite 750
Washington, DC 20006
T: 202.463.6036
F: 202.463.6067
jack.jarrett@leschtlaw.com
*Counsel for Plaintiff*

26

## <u>VERIFICATION</u>

**Paul Nesbit** hereby affirms under penalty of perjury that he has reviewed the foregoing interrogatory responses and believes them to be true and accurate to the best of his recollection and knowledge.

_____

Paul Nesbit